UNITED STATES of America, Appellee,

v.

**Dennis Lloyd PARDEE, Appellant.**

**No. 10440.**

United States Court of Appeals
Fourth Circuit.

Argued June 3, 1966.

Decided Sept. 14, 1966.

Rehearing Denied Nov. 2, 1966.

See also, 4 Cir., 356 F.2d 982.

Paul T. McHenry, Jr., Baltimore, Md.
(Emmett H. Nanna, Jr., Hyattsville,

Md., and Anthony J. Sacco, Towson, Md., on the brief) for appellant.

Arthur G. Murphy, Asst. U. S. Atty. (Thomas J. Kenney, U. S. Atty., on the brief) for appellee.

Before HAYNSWORTH, Chief Judge, and BRYAN and BELL, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

Tried on a 5-count indictment in the District Court, Dennis Lloyd Pardee was convicted on the first count of involuntary manslaughter, under 18 U.S.C. § 1112, and on the fifth count of driving a motor vehicle on the wrong side of the road, under regulations of the Secretary of the Interior.[1] The other three counts were dismissed on defendant's motion before the case was submitted to the jury. Both offenses occurred July 6, 1965, in Maryland upon the Federal portion of the Baltimore-Washington Parkway.[2]

Appealing, Pardee assigns basically three errors in his convictions: (1) indictment of his conduct as violative of the Federal statute and regulations, when the laws of Maryland governed exclusively; (2) insufficiency of the evidence to convict on either count; and (3) the Court's refusal to charge the jury on either criminal intent, or the nature of the element of unlawfulness, in the crime of involuntary manslaughter.

We hold the indictment sound in premising its accusations upon the Federal law and regulation. As the violation of the regulation, driving on the wrong side of the road, was adequately proved, we affirm the conviction on that count. However, in the absence of a more expanded jury instruction on the essential of unlawfulness, we must reverse the homicide conviction.

The Parkway, for our purpose, may be considered as running north and south. The roadway for southbound traffic—from Baltimore towards Washington—consists of several lanes and is separated from the northbound route by wide median spaces. Shortly after midnight, the early morning of July 6, 1965, Pardee was driving eastwardly on a State highway, Route 197, and approaching the Parkway from the west. So proceeding, he would come first to the southbound artery of the Parkway, but his destination was more directly reached via the northbound route. Nearing the intersection of the Parkway and the State highway, he turned to his right upon an access road leading up from the highway to the Parkway, which was at a higher level than the highway.

In this course he passed, on the State highway, on the access road, and at the entry to the Parkway, several directional signs cautioning that he was approaching the southbound lanes of the Parkway leading to Washington. Notwithstanding, instead of bearing to the right and merging with the southward traffic on the Parkway, he made a virtually 180° left turn and drove across its southbound lanes into the easternmost and fast lane. Continuing northwardly in this path for approximately 1700 feet, his car collided with an automobile going south, resulting in the death of its driver.

I. The regulations cover generally the "park areas", and it is conceded that the Parkway is such a "park area" in Maryland. 36 CFR 3.1, 3.4. The regulation upon which the defendant was convicted reads as follows:

"§ 3.32 Reckless driving; prohibited operations.

"Persons operating motor vehicles within areas covered by this part shall drive in a safe manner. The following are prohibited:

\* \* \* \* \* \*

"(d) Driving on wrong side of street or road."

---

1. National Capital Parks Regulations, Part 3, 36 CFR 3.32(d), promulgated pursuant to authority provided in 16 U.S.C. § 3.

2. For a comprehensive discussion of concurrent Federal and State jurisdiction over the Parkway, see opinion of Chief Judge Thomsen in United States v. Dreos, 156 F.Supp. 200, 202–207 (D.Md.1957).

The defendant's assertion that this regulation is not applicable rests on the following regulations within the same codification:

"§ 3.3 Applicability of \* \* \* State laws.

\* \* \* \* \* \*

"(b) In areas to which this part is applicable, located outside the geographical limits of the District of Columbia, the laws of the State within which the area is located shall be invoked and enforced *in accordance with the act of June 25, 1948* (62 Stat. 686; 18 U.S.C. sec. 13) [Assimilated Crimes Act]." (Accent added.)

\* \* \* \* \* \*

"§ 3.29 Laws and regulations applicable to traffic control; enforcement.

"(a) \* \* \* Maryland \* \* \* laws and regulations. [T]he laws of Maryland, \* \* \* as adopted by the act of June 25, 1948 (62 Stat. 686; Title 18 U.S.C. sec. 13) [Assimilated Crimes Act], shall constitute the traffic and motor vehicle regulations enforceable under the act of March 17, 1948 (62 Stat. 81) [authorizing, inter alia, arrests by United States Park Police for violation of regulations], in all areas covered by this part [the part containing all regulations discussed herein] within their respective geographical limits *unless otherwise provided for by act of Congress or the regulations contained in this part* \* \*." (Accent added.)

The defendant accordingly relies on the Assimilated Crimes Act, 18 U.S.C. § 13, reading as follows:

"§ 13. Laws of States adopted for areas within federal jurisdiction.

"Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title [18 USC 7, declaring the territorial jurisdiction of United States], is guilty of any act or omission which, *although not made punishable by any enactment of Congress,* would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment." (Accent added.)

 The defendant argues that Congress has in this manner unequivocally directed that the State traffic laws exclusively shall govern the operation of motor vehicles on the Baltimore-Washington Parkway. This argument is addressed to both counts. On the manslaughter count, the defendant notes, Maryland has a special statute, Annotated Code of Maryland (1957), Article 27, § 388, creating manslaughter by automobile as a distinct offense, and classifying it as a misdemeanor. The contention is that the Assimilated Crimes Act invokes this State statute to the exclusion of the Federal manslaughter statute making such a homicide a felony.

The District Judge overruled these arguments, and quite correctly, we think. To begin with, it is evident that § 3.3, supra, refers to general laws; § 3.29, supra, deals specifically with traffic control laws and regulations, thus predominating over § 3.3 as to this special matter. Again, § 3.3 calls into play only such State laws as are inducted by the Assimilated Crimes Act, which, as noted post, is not applicable where, as here, the Federal Government has spoken. Moreover, the applicability of the State traffic laws is excepted by the very regulation, § 3.29, on which the appellant relies. That section excludes the State law where it has been "otherwise provided for by act of Congress, or the regulations contained in this part". Since the Secretary of the Interior, as authorized by Congress, has prohibited, in § 3.32(d), "Driving on wrong side of street or road", such offense has been "provided" by the regulations within the reservation of § 3.29. In so excluding the State traffic law, the penalties named therein are, contrary to the appellant's contention, also rendered inapplicable, and the punishment stated in the regulations, § 3.5, is substituted therefor.

■ The same conclusions apply in respect to the law of involuntary manslaughter. Here Congress has proscribed it as a felony and fixed the punishment, all without ambiguity. Found in 18 U.S.C. § 1112, so far as pertinent, the crime is denounced as follows:

"Manslaughter.

"(a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

"Voluntary—* * *

"Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death."

Obviously, then, the offense here is beyond the scope of the Assimilated Crimes Act since the latter by its terms embraces only "any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed * * * within the jurisdiction of the State", and thereby excludes conduct made punishable by Congress. With respect to the alleged incorporation by §§ 3.3 and 3.29 of the Maryland automobile manslaughter statute, it is enough to say that here this statute has been preempted by the Federal manslaughter act.

These conclusions do not depart from the holding in United States v. Dreos, supra, 156 F.Supp. 200 (D.Md.1957). The offense charged there was the operation of a motor vehicle at a speed in excess of the posted limit. No Federal speed regulation was pleaded as effective on the Parkway in Maryland. Indeed, the regulations provide, § 3.31(b), that the speed limitations established by Maryland should control on the segments of the Parkway within its boundaries. No such specific incorporation of State law exists here.

II. The jury's finding of guilt beyond a reasonable doubt of wrong-way driving was certainly not without evidential warrant. This is apparent from the outline of the facts heretofore included, which is but a summary of the evidence when appraised in the light most favorable to the prevailing party, the prosecution. See United States v. Sawyer, 294 F.2d 24, 31 (4 Cir. 1961), cert. den., 368 U.S. 916, 82 S.Ct. 196, 7 L.Ed.2d 132 (1961).

■ III. The District Court was right, too, in charging the jury that an intent on the defendant's part to violate the regulation was not an element of the offense and need not be proved. It is a police regulation and conviction of its breach requires no proof of intent. See United States v. Balint, 258 U.S. 250, 251–252, 42 S.Ct. 301, 66 L.Ed. 604 (1922). A bald transgression of its commandment is enough to warrant a verdict of guilt on the regulation-count alone.

IV. However, more is necessary to establish the regulation-violation as an unlawful act essential to sustain a conviction of involuntary manslaughter under 18 U.S.C. § 1112, supra. We do not agree with the Government's contention that *any* unlawful act proximately causing the death is sufficient to fulfill the demand of the statute that death be the result of an unlawful act. Our disagreement with the District Court is that the full character of the unlawful act as an ingredient of involuntary manslaughter was not completely explained to the jury.

■■ The clause of the Federal manslaughter statute touching the instant case reads, "Involuntary—In the commission of an unlawful act not amounting to a felony * * *." The remainder of the definition is inapposite because the defendant's reverse travel was in no sense a lawful act, and hence its manner of execution is immaterial. This statutory definition, we think, was not intended to deviate from the universal concept of the crime. As neither intent nor malice is a factor of involuntary manslaughter, and neither is charged in this case, we make no further mention of them.

A thorough and authoritative exposition of the crime was written by the late

Judge Chesnut in State of Maryland v. Chapman, 101 F.Supp. 335, 340–341 (D. Md.1951). True, the case arose not under the Federal statute but under Maryland law, inasmuch as it was a removal of the State's prosecution of a Federal officer. However, the discussion was directed to the fundamentals of involuntary manslaughter. Approving enunciations of the Maryland Court of Appeals on the subject, Judge Chesnut said that involuntary manslaughter is a felonious homicide in which one takes the life of another without legal excuse " 'unintentionally while needlessly doing anything in its nature dangerous to life, or * * * by neglecting a duty imposed either by law or by contract.' "

Judge Chesnut thus points to two separate divisions of the unlawful act, i. e. (1) an act "in its nature dangerous to life" and (2) an act constituting negligence. The first is self-explanatory and the second he expounds as follows:

"In my view the law is reasonably clear that a charge of manslaughter by negligence is not made out by proof of ordinary simple negligence that would constitute civil liability. In other words, the amount or degree or character of the negligence to be proven in a criminal case is *gross* negligence, to be determined on the consideration of all the facts of the particular case, and the existence of such gross negligence must be shown beyond a reasonable doubt. If the resultant deaths were merely accidental or the result of a misadventure or due to simple negligence, or an honest error of judgment in performing a lawful act, the existence of gross negligence should not be found."

Accord, Duren v. State, 203 Md. 584, 102 A.2d 277, 279 (1954).

While it is frequently said there is no Federal criminal common law —Federal crimes being exclusively dependent upon statutes of the United States—certainly the statute's terms, when known to and often derived from the common law, are referable to it for interpretation. Thompson v. United States, 227 F.2d 671, 673 (5 Cir. 1955); Williams v. United States, 179 F.2d 644, 647 (5 Cir. 1950). On this authority we ascribe to the statutory phrase "unlawful act" the connotations inferred by Judge Chesnut and just quoted. Our research vouches his definitions and refinements as an accurate exegesis of the law of involuntary manslaughter from the origin of the crime to the present time. Bell v. Commonwealth, 170 Va. 597, 195 S.E. 675, 680–681 (1938); State v. Blankenship, 229 N.C. 589, 50 S.E.2d 724, 729 (1948); State v. Dixon, 181 S.C. 1, 186 S.E. 531, 534 (1936); see also the collection of pertinent precedents in 161 A.L.R. 10, 12 fn. 5 (1945); 26 Am.Jur., Homicide, § 210, at 299.

These principles when submitted to a jury, it is generally understood, must be accompanied with certain particularizations. "Gross negligence" is to be defined as exacting proof of a wanton or reckless disregard for human life. Furthermore, to convict, the slayer must be shown to have had actual knowledge that his conduct was a threat to the lives of others, or to have knowledge of such circumstances as could reasonably be said to have made foreseeable to him the peril to which his acts might subject others. The reason of the latter comment is that awareness of the tendency to danger, or the foreseeability of injury, from the act or omission is an indispensable element of negligence. Copeland v. State, 154 Tenn. 7, 285 S.W. 565, 49 A.L.R. 605 (1926); State v. Tankersley, 172 N.C. 955, 90 S.E. 781, 783, L.R.A. 1917C, 533 (1916). This requirement of proof gains stature when it is recalled that death as a result of an accident, that is an occurrence unpurposed and unattributable to negligence, does not give rise to civil or criminal liability. State v. Legg, 59 W.Va. 315, 53 S.E. 545, 546, 3 L.R.A.,N.S., 1152 (1906); State v. Horton, 139 N.C. 588, 51 S.E. 945, 946, 1 L.R.A.,N.S., 991 (1905). On a new trial, of course, the circumscriptions of the crime can be stressed to the jury.

**375**

Although requested to instruct the jury that the unlawful act must have one or more of these characteristics—inherent danger to life or gross negligence—the Court declined to charge in this respect. Doubtlessly it was of the opinion, and not illogically, that under the facts of the case the wrong-way driving *in itself* proved the knowingly and "needlessly doing [of an act] in its nature dangerous to life" or a wanton or reckless disregard for human life; therefore potential danger or recklessness was not made an issue by the evidence. Nevertheless, we think resolution of this question should have been left to the jury. For this determination the jury would be told to measure the conduct of the defendant against all of the existing circumstances and determine therefrom whether what he did was in its nature dangerous to life or grossly negligent.

Mistake or inadvertence of Pardee in turning his car to the north while in the southbound roadway would not necessarily excuse him, and the Court rightfully refused to charge unqualifiedly on these contentions. Actually, either of these possibilities could constitute gross negligence and thus provide this element of involuntary manslaughter. However, these considerations will be embodied, and are fairly submitted, in the admonition to the jury that it may not convict unless it believes beyond a reasonable doubt that the wrong-way driving was the result of more than simple negligence—that it must amount to wanton and reckless disregard for human life, or conduct in itself imperilling the safety of another on the Parkway.

The sentences of the Court were imprisonment of 183 days on the first count—manslaughter—and six months on the fifth count—wrong-way driving—the terms to run concurrently. We affirm the judgment on the latter, but set aside the judgment on the first count, remanding it for a new trial.

Affirmed in part and reversed in part.

On Petition for Rehearing

ALBERT V. BRYAN, Circuit Judge:

The petition of the appellant for a rehearing will be denied. The points now made were not urged originally, but in any event we do not think they are well taken.

However, for further clarity we supplement the opinion of the Court to this extent. Notwithstanding that the offense under Count 5—wrong-way driving—may be included in the Count 1 charge of involuntary manslaughter, the District Judge did not err in also taking a verdict on Count 5 and in also passing a sentence upon that verdict to run coincidently with the manslaughter sentence. The wrong-way driving verdict and sentence were not void. Green v. United States, 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961); United States v. Lawrenson, 298 F.2d 880, 889 (4 Cir. 1963) with opinion by Judge Bell; cf. Sawyer v. United States, 312 F.2d 24 (8 Cir. 1963); contra United States v. Machibroda, 338 F.2d 947 (6 Cir. 1964). Our disposition of the manslaughter conviction confirms that the sentence on the lesser count was not inadvisable, for it achieves the expedition of permitting a valid, severable and uncontradicted jury determination to survive should the Government choose to drop its manslaughter charge on remand. The appellant will be assured, however, that he is in no way prejudiced by the turn the prosecution has taken.

To this end we will direct that if the United States prosecutes the appellant again on Count 1, then before the retrial the District Court shall vacate the verdict and sentence under Count 5, and order that the new trial proceed on both counts. If a conviction results on each of them, then sentence shall be imposed on the two counts with the proviso that the conviction under Count 5 shall not stand thereafter, in addition to the conviction under Count 1, if the latter becomes final. On the other hand, if the Government now abandons the prosecution of Count 1, then the present judg-

376

ment on Count 5 shall remain in full force and effect.

An order will be entered denying the petition for rehearing and remanding the case to the District Court for proceedings not inconsistent with the original opinion as supplemented herein.

Petition for rehearing denied with directions.